William H. MAHOOD,

v.

OMAHA PROPERTY AND CASUALTY.

No. CIV.A. 00–1994.

United States District Court, E.D. Pennsylvania.

Aug. 31, 2001.

Derek T. Braslow, Sherman, Silverstein, Kohl, Rose & Podolsky, Pennsauken, NJ, for plaintiff.

Daniel D. Krebbs, Marshall, Dennehey, Warner, Coleman & Goggin, Philadelphia, PA, Gerald J. Nielsen, John D. Carter, Nielsen Law Firm, Metairie, LA, for defendant.

### MEMORANDUM AND ORDER

SHAPIRO, Senior District Judge.

Plaintiff Dr. William H. Mahood ("Mahood"), filing a complaint against Omaha Property and Casualty ("Omaha"), initially alleged breach of contract and bad faith in connection with a flood insurance claim. Because the flood insurance policy in dispute is a Standard Flood Insurance Policy ("SFIP"), issued under the National Flood Insurance Act of 1968, 42 U.S.C. § 4001 *et seq.*, federal law governs this dispute [1] and state claims are preempted; plaintiff voluntarily withdrew his state law-based claims and is proceeding on a claim under the policy. The court held a non-jury trial on plaintiff's SFIP claim for partial denial of coverage. In accordance with Federal Rule of Civil Procedure 52(a), the court enters the following findings of fact and conclusions of law:

### I. FINDINGS OF FACT

1. Mahood is the owner of the property located at 6250 West Valley Green Road, Flourtown, Pennsylvania 19031.

2. Part of the building structure on said property (the Mahood home) was constructed in approximately 1746; an addition was built in the 1980's. The premises are situated on a flood plain.

3. At all times relevant hereto, plaintiff's property was insured by a Standard Flood Insurance Policy ("SFIP"), codified at 44 C.F.R. Pt. 61, App. A(1) (1998), issued by defendant Omaha.

4. The instant SFIP covered the building only (no contents coverage) with the limit of $250,000.00, less a $1,000.00 deductible. $250,000.00 is the maximum amount of insurance available under the National Flood Insurance Act.

5. The replacement cost of the Mahood home would be $296,000.00. Tr. at 23–24.

6. On September 16, 1999, during Hurricane Floyd, there was a flood loss to Mahood's home. Tr. 2/76.

---

1. *See* 44 C.F.R. Pt. 61 App. A(1) Art. 11 (1998) ("This policy is governed by the flood insurance regulations issued by FEMA, the National Flood Insurance Act of 1968, as amended (42 U.S.C. 4001, *et seq.*) and Federal common law."). *See also Neill v. State Farm Fire and* *Casualty Co.*, 159 F.Supp.2d 770 (E.D.Pa. 2000) (McLaughlin, J.) (dismissing UTPCPL, bad faith and breach of contract claims in litigation involving an SFIP on the ground that they are preempted by federal law).

7. The insurance policy with Omaha was in full force and effect on the date of the loss.

8. During the flood, waters rose to a level of approximately 39 inches inside the home.

9. The home was uninhabitable after the flood; the flood damaged the first floor structure and electrical, plumbing, and mechanical systems. In addition, Mahood's well water was not consumable.

10. After the flood, the furniture inside the home was in disarray. Floors were buckled and wall plaster was peeling. Tr. at 36–37. The paint on the walls and trim was peeling and there was mud and muck everywhere. Tr. at 149, 2/77. The walls and ceilings of the entire first floor were covered with a powdery mildew and a putrid odor permeated the home. Tr. at 60, 149–50, 2/77.

11. Every surface of the kitchen was affected by the flood. Tr. at 37.

12. Every surface of the dining room was affected by the flood. Tr. at 40.

13. Every surface of the powder room was affected by the flood. Tr. at 41.

14. The living room suffered the worst damage. Tr. at 42. The walls of the living room were comprised of an eighteen-inch thick stone wall, plastered over; in front of the stone wall was a stud system of two-by-fours, sheathed with wire lath and more plaster. Both wall systems needed repair. Tr. at 67–68.

15. The living room floor joists all needed replacement and all were replaced. Not all the joists were flood-damaged; some were rotted due to their age. Tr. at 57–59.

16. On or about September 24, 1999, an independent adjuster from Simsol Insurance Services ("Simsol") inspected the premises on behalf of Omaha to determine the flood damage.

17. Robert Reinhart of Simsol estimated that the Mahood home suffered covered damages that would cost $83,053.54 to repair.

18. From this amount, Omaha deducted depreciation in the amount of $9,721.15. The claim was further subject to a deductible of $1,000.00. Omaha considered the payable claim to be $72,332.39.

19. Upon proper proof of repairs, Omaha was willing to pay an additional $9,502.74 it said had been subtracted for depreciation.

20. Omaha did not provide evidence supporting the Simsol estimate at trial.

21. Mahood hired his own public adjuster, Young Adjusting Company ("Young").

22. Richard Reigner ("Reigner") was the Young employee assigned to adjust Mahood's loss. Reigner is a licensed public insurance adjuster in Pennsylvania and New Jersey and has been employed by Young for the past fourteen years. Tr. at 78–79.

23. Reigner was contacted by Mahood approximately two weeks after the flood. Tr. at 82.

24. Reigner retained David Ozeroff ("Ozeroff"), a general contractor and vice-president for the Howard Louis Corporation ("Howard Louis") to estimate the damage to the Mahood home and the cost of repairing it to pre-flood condition. Tr. at 92.

25. Ozeroff has prepared insurance estimates for fire, water and wind restoration over the past twenty years for Howard Louis; he has prepared estimates for damage from hundreds of floods. Tr. 2/12–14.

26. Ozeroff prepared his estimate by going to the Mahood home after it had dried out and doing a room-by-room evaluation, measuring and calculating what was necessary to restore the home to its pre-flood condition. Tr. 2/21.

27. Ozeroff estimated the cost to repair the damage to the plaster on the walls only up to four feet. Tr. 2/25–26, 28.

28. Because all the electrical wiring was submerged during the flood, it was damaged. Ozeroff concluded the home's electrical system needed replacement. The pre-flood system was "nob and tube" wiring which is no longer available; it had to be replaced by vinyl-covered wire. Ozeroff could not make a replacement price comparison because of the unavailability of the original materials. Tr. 2/31–32.

29. Ozeroff's estimate contains a subcontractor bid for painting from David Ryder Painting ("David Ryder") in the amount of $80,376.00. This painting estimate does not delineate what portion of the painting was to be done below the water line and what portion above the water line. In addition, the painting estimate contains costs for lead abatement, without delineating which portion of the bid is for lead abatement, and it includes the cost of treating and painting the home's exterior.

30. David Ryder would have "encapsulated" the areas being painted even if there were no lead paint to abate. Tr. at 147–48.

31. The entire exterior of the home needed to be washed, treated with mildewcide, and repainted for a proper appearance, even though the second floor was not directly touched by the flood waters. Tr. at 148.

32. David Ryder did not paint the Mahood home. Michael Byrne Painting ("Michael Byrne") painted the interior first floor hall, stairs and foyer, powder room, living room, dining room, pantry, kitchen, and the basement. Michael Byrne did not paint the exterior of the home. The total price invoiced for the painting was $26,700.00, $53,676.00 less than David Ryder's estimate (contained in Ozeroff's calculations). P–18.

33. Ozeroff's estimate included 10% overhead and 10% profit. Also included was the cost of insurance, taxes, and permits. Insurance and taxes totaled three percent of carpentry, labor and supervision costs. Ozeroff could not recall whether permits were estimated at $20.00 for the first thousand, and $10.00 for each thousand thereafter or whether he had received a quotation for permits needed for this job. Tr. 2/46–49.

34. On or about December 22, 1999, Ozeroff submitted an estimate in the sum of $241,569.00.

35. Reigner added items not included in Ozeroff's estimate, bringing his adjustment figure for the loss to $252,454.00. P–3.

36. Ozeroff did not do any of the actual repair work on the Mahood home.

37. Mahood hired Wesley Thomas Sessa ("Sessa"), owner of 18th Century Restoration, Inc. ("18th Century"), a historic restoration contracting firm, as the general contractor to repair the flood loss. Mahood has paid 18th Century $137,817.00 for work performed on the house. Tr. at 26–27, 30–31, 74.

38. McErlean Plumbing & Heating billed Mahood $18,478.00 for repairs to the plumbing and heating systems. P–16, P–17. Some of the work done was on the second and third floors of the home. It appears from an undated "Billing Summary Report" that only $7498.00 of the work was "related to flood damage." P–16.

39. H & S Electric billed Mahood $19,510.47 for "electrical service." It is unclear what "electrical services" were rendered or whether they related to the flood loss.

40. Val Jermacans, a carpenter, billed Mahood $4,862.85.

41. Eldredge–Ferrero, submitted a bid to Mahood for $2,104.50 for cleaning flood silt from his property; no invoice was provided to the court. P–21.

42. On or about January 13, 2000, Mahood signed and submitted to Omaha two proof of loss statements, one for the sum of $72,332.39 ($83,053.54 less depreciation and deductible), supported with documentation of the independent Simsol adjuster, and a second one claiming an additional sum of $167,946.46 ($250,000.00 less $82,053.54). P–6, P–7.

43. On or about January 25, 2000, Omaha tendered Mahood check number 7016208 in the sum of $72,332.39.

44. Omaha denied Mahood's proof of loss statement for $167,946.46. Dean Schechinger ("Schechinger"), Senior Claim Examiner for Omaha, sent a letter to Mahood dated, January 25, 2000, denying the claim because "this amount include[d] repair costs that may not be covered under Your Standard Flood Policy." The letter stated that Omaha could not "specify the repair work that is excluded," but the "policy cannot indemnify repairs and restoration ... because the **Insuring Agreement** does not indemnify **Antique Value**." (emphasis in original) The letter stated the policy would not cover lead abatement costs either. Tr. at 108–9; P–9.

45. Mahood and Reigner received another letter from Schechinger, dated March 14, 2000, requesting "paid invoices and cancelled checks for the repairs" made so Omaha could properly consider Mahood's request for recovery of the $9,502.74 depreciation deduction and again raising the lead paint abatement and antique value [2] issues with regard to the second proof of loss statement. The letter also contested coverage of damage to the ceilings (which were not in direct contact with the flood waters) and coverage for replacement of the floor joists. The letter explained that only items directly damaged by flood are covered and requested submission of invoices for repairs made to the floor joists. P–10.

46. The March 14, 2000 letter expressed Omaha's "willingness to discuss th[e] claim ... or to consider any documentation to support" the second proof of loss. P–10.

47. Omaha claims it mailed the March 14, 2000 letter because it had questions regarding: (1) the apparently duplicative estimates for $5,000.00 to repair and replace the gas and water lines and another $2,500.00 to test the lines; and (2) the necessity of removing and replacing all first floor windows. Tr. at 2/125. These concerns were not raised in the March 14, 2000 letter. P–10.

48. No documents were sent to Omaha in response to the March 14, 2000 letter.

---

**2.** It appears from this letter that Omaha was confused by the name of the general contracting company: 18th Century Restoration. The March 14, 2000 letter states:

> As we understand it, the demand [for $150,000] is grounded in part in the [sic] Dr. Mahood's belief that the policy ought to respond to his need to restore his property to 18th century materials and design.

> However, his policy cannot indemnify damages to this extent since it does not provide coverage for any antique value.

P–10, at 2. This statement is followed by a quotation of the language from the policy concerning "antique value." There was no evidence that Mahood is seeking recovery for "antique value" or that repairs made were of 18th century materials or design.

Tr. at 129. Reigner's impression from a conversation he had with an Omaha adjuster was that Omaha would not pay any more on the claim; Reigner suggested that Mahood speak to counsel. Tr. at 131–32.

49. On April 17, 2000, Mahood filed this lawsuit. During its pendency, a National Flood Insurance Program ("NFIP") General Adjuster performed a reinspection of the loss.

50. Sometime between February 20, 2001 and March 6, 2001, counsel for plaintiff delivered to Omaha[3] invoices from 18th Century Restorations, McErlean Plumbing & Heating, H & S Electric, Michael Byrne Painting, and Val Jermacans, to document the cost for repairs actually made to the Mahood home. Counsel for plaintiff also provided Omaha with an estimate from Eldredge–Ferrero for cleaning silt from the property.

## II. DISCUSSION

This court has subject matter jurisdiction to decide the issues presented. *See* 42 U.S.C.A. § 4072 (West 1994 & Supp.2001); *Van Holt v. Liberty Mutual Fire Ins. Co.,* 163 F.3d 161, 166–67 (3d Cir.1998) (federal district court has subject matter jurisdiction over SFIP-based lawsuit). Omaha is a "Write Your Own" ("WYO") flood insurance carrier permitted to issue flood insurance backed by the Federal Emergency Management Agency ("FEMA"). *See* 44 C.F.R. § 62.23 (1998). In this capacity, Omaha is a fiscal agent of the United States and a proper defendant in this action. *See* 42 U.S.C.A. § 4071(a)(1)(West 1994 & Supp.2001); *Van Holt,* 163 F.3d at 165.

Mahood's flood insurance policy incorporates the flood insurance regulations issued by the FEMA and the National Flood Insurance Act of 1968, as amended, 42 U.S.C. § 4001, *et seq.;* federal common law governs the policy's interpretation. *See* 44 C.F.R. Pt. 61 App. A(1) Art. 11 (1998); *Linder & Assoc., Inc. v. Aetna Casualty and Surety Co.,* 166 F.3d 547, 550 (3d Cir.1999) (denying SFIP coverage for damage to lower level of building because it was a basement as defined in the policy and the policy does not cover flood damage to basements). The policy must be strictly construed because it is, in effect, a suit against the government. *See Kennedy v. CNA Ins. Co.,* 969 F.Supp. 931, 934 (D.N.J.1997), *aff'd w/o opn,* 156 F.3d 1225 (3d Cir.1998) (plaintiffs' failure to submit proof of loss to insurer bars claim for damages).

The state-law based claims having been dismissed, there are two main issues: (1) whether Mahood is barred from recovering under the policy because he did not document his repair claims prior to commencement of this lawsuit; and if he is not barred, (2) whether Mahood is entitled to additional money from Omaha under the policy.

### Coverage

The policy insures against "direct physical loss by or from flood." 44 C.F.R. Pt. 61, App. A(1) (1998). A "direct physical loss by or from flood" is defined as "any loss in the nature of actual loss or physical damage, evidenced by physical changes, to the insured property (building or personal property) which is directly and proximately caused by a flood (as defined in this policy)." 44 C.F.R. Pt. 61 App. A(1), Art. 2 (1998). The insured is covered to the

---

**3.** The invoices were mailed to National Flood Insurance Program ("NFIP") General Adjuster, Owen Ivey ("Ivey"). J–1. Omaha contends that is not same as submitting the documents to it. J–1. This court has held that submission to Ivey was submission to Omaha. Tr. at 2/95–96.

lesser of the actual cash value (not including antique value) or the amount it would cost to repair or replace the property with "material of like kind and quality within a reasonable time after the loss." 44 C.F.R. Pt. 61 App. A(1) (1998). "Actual cash value" is "the replacement cost of an insured item of property at the time of loss, less the value of physical depreciation as to the item damaged." 44 C.F.R. Pt. 61 App. A(1), Art. 2 (1998). However, when the total amount of insurance exceeds 80% of the full replacement cost of the home or the policy provides the maximum amount of coverage available, the policy is extended to include "the full cost of repair or replacement (without deduction for depreciation)." 44 C.F.R. Pt. 61 App. A(1), Art. 8A (1998). "When the full cost of repair or replacement is more than $1,000 or more than 5 percent of the whole amount of the insurance applicable ... [Omaha] will not be liable for any loss under subparagraph A .... unless and until actual repair or replacement is completed." 44 C.F.R. Pt. 61 App. A(1), Art. 8D (1998).

### Procedural Requirements

Under the policy, when an insured suffers a covered flood loss, among other things, the insured must: (1) notify its insurer in writing; (2) separate the damaged from the undamaged property so that it may be examined by the insurer; (3) send the insurer a proof of loss within 60 days of the loss; (4) cooperate with the insurer's adjuster in the investigation of the claim; and (5) document the loss with bills, receipts and related documents. 44 C.F.R. Pt. 61, App. A(1), Art. 9J 1–5 (1998). The proof of loss must contain the following information: (1) the date and time of the loss; (2) a brief explanation of how the loss occurred; (3) the insured's interest in the damaged property and if applicable, the interest of any others in the property; (4) the actual cash value or replacement cost of each damaged insured item and the amount of damage sustained; (5) names of mortgagees or any other lienholder; [4] and (6) the amount claimed under the policy, including the policy limits and the lesser of the cost to repair or replace the damaged property. 44 C.F.R. Pt. 61, App. A(1), Art. 9J 3 (1998).

There is no contention that Mahood failed to notify Omaha of the loss or to submit timely a signed Proof of Loss meeting the policy's requirements. Omaha objects to the filing of the lawsuit on the basis that Mahood failed to submit requested documentation of the completed repairs. Article 9J5 requires an insured to "[d]ocument the loss with all bills, receipts, and related documents for the amount being claimed." 44 C.F.R. Pt. 61, App. A(1), Art. 9J5 (1998).

Article 9K1 states that if Omaha

specifically request[s] it, in writing, [Mahood] may be required to furnish [Omaha] with a complete inventory of the destroyed, damaged and undamaged property, including details as to quantities, costs, actual cash values or replacement cost (whichever is appropriate), amounts of loss claimed, and any written plans and specifications for repair of the damaged property which [Mahood] can reasonably make available to [Omaha].

44 C.F.R. Pt. 61, App. A(1), Art. 9K1 (1998). Read together, Omaha argues, these two provisions require the insurer to document a flood loss, maintain those records, and supply them to the SFIP-insurer if such documentation is specifically requested.

---

4. A question was raised at the final pre-trial conference whether mortgagees were notified and whether they should have been joined as parties to the litigation. Neither party chose to pursue this inquiry.

By letter dated March 14, 2000, after Omaha had already paid Mahood $72,332.39 for his first proof of loss, Omaha requested documentation from Mahood regarding the repair costs for painting the ceilings and replacing the living room floor joists.[5] The letter also expressed Omaha's willingness to discuss the claim or to consider any additional documentation supporting Mahood's demand. Because Mahood did not comply with this request, Omaha argues that Mahood is precluded from initiating this litigation. Under Article 9R, an insured may not sue the insurer "to recover money under th[e] policy unless [the insured] has complied with all the requirements of th[e] policy." 44 C.F.R. Pt. 61, App. A(1), Art. 9R (1998).

■ There is no dispute that Mahood chose to commence a lawsuit against Omaha instead of complying with Omaha's request for additional documentation.[6] However, nowhere in the policy does it state that an insured must supply invoices, cancelled checks, or other documentation proving the repairs were actually completed on the insured property or their cost. Article 9K1 requires, if specifically requested, "a complete inventory of the destroyed, damaged and undamaged property," and "any written plans and specifications for repair," not documentation of repairs actually completed. Article 8D states that when the full cost of repairs exceeds a certain amount (which the repairs here do), the insurer is not liable until they are complete, but it does not require the insured to submit any documentation proving the repairs are complete or what they cost. Article J5 requires documentation of "the loss," not the repairs performed, and does not require submission of the documentation. *See Burns v. FEMA*, 84 F.Supp.2d 839, 846 (S.D.Tx.2000) (SFIP-insured was not required to supply "bills, receipts and related documents" absent a written request to do so; Article 9J5 is not linked to the 60–day time limit for submission of claims).

Strict construction of the policy is required, but the above-cited provisions cannot reasonably be construed in accordance with Omaha's interpretation.[7] Mahood

5. Arguably, Omaha should have requested this documentation before approving and paying Mahood's first proof of loss because the full cost of those repairs exceeded $1,000.00 and $12,500.00 (5% of the applicable insurance) and Art. 8D of the policy disavows any liability on Omaha's part "unless or until the repair or replacement is completed" under these circumstances.

6. Both sides had another option available. Under the policy,
[i]f at any time after a loss, [the insurer is] unable to agree with [the insured] as to the actual cash value or, if applicable, replacement cost of the damaged property so as to determine the amount of the loss to be paid to [the insured], then, on the written demand of [either party], each [ ] shall select a competent and disinterested appraiser.... The appraisers shall then appraise the loss ... and, failing to agree, shall submit their differences, only, to the umpire. An award

in writing ... when filed with [Omaha] shall determine [the issue].
44 C.F.R. Pt. 61, App. A(1), Art. 9N (1998). After the non-jury trial of this matter, the court ordered the parties to submit post-trial briefs on the issue of why this action should not be stayed pending compliance with 44 C.F.R. Pt. 61, App. A(1), Art. 9N. Neither party wished to invoke the appraisal provision and they have thus waived it.

7. It may be Omaha's practice to require submission of proof that the repairs were done in order for an insured to recover for repairs exceeding the estimated actual cash value of the loss once it has been paid, but nowhere in the policy is this practice expressly stated as a requirement for recovery. Under Article 8D, Omaha is not "liable for any loss ... unless and until actual repair or replacement is completed," but there is no policy provision requiring proof that repairs were done and what they cost.

had one year from the denial of his second proof of loss to commence a lawsuit.[8] It would have been desirable to adjust the loss claim with Omaha before commencing this lawsuit, but Article 9R does not preclude its commencement. An inventory of damaged and undamaged property and plans for repair had to be submitted on request, but documents proving actual repairs were not expressly requested by Omaha nor is their submission required by the policy.

The SFIP employs a variety of entirely unambiguous phrases when it imposes a duty on an insured to send [its] insurer various materials, as opposed to a duty to simply generate or maintain those materials. For example, the insured must "notify" [its insurer] of the loss [Art. 9J1]; must "send" [its insurer] a Proof of Loss [Art. 9J3]; and must "furnish" [its insurer] with various information [Art. 9J3 a-i].

*Burns,* 84 F.Supp.2d at 846. If Articles 9J5 or 8D were meant to require an insured to send Omaha "bills, receipts, and related documents" when "actual repair or replacement is completed," they would have employed a word such as "notify," "furnish," or "send." *See id.* Further, Article 9K1, requiring certain documentation upon request of the insurer, would be redundant if, as Omaha suggests, Article 9J5 were read to require "bills, receipts, and related documents" to be sent to it. *See id.* Mahood is entitled to reimbursement for actual repairs covered by the policy to the extent he had proven their cost exceeds the amount Omaha has already paid him.

### Amount Due Under The Policy

■ Mahood is entitled to recover the $9,721.15 Omaha deducted for depreciation. The policy coverage exceeds eighty percent of the full replacement cost of the Mahood home,[9] and provides the maximum amount of coverage allowed, so no depreciation should have been deducted. *See* 44 C.F.R. Pt. 61, App. A(1), Art. 8A (1998). Omaha's withholding this amount and its refusal to comply with Mahood's request for recovery of the depreciation deduction unless he supplied "paid invoices and cancelled checks for the repairs" is contrary to the express terms of the policy; Omaha should not have made the deduction.

■ Mahood might have been entitled to more than the $83,053.54 (minus the $1,000 deductible) at which Simsol valued his flood loss but there has been a failure of proof in this regard. Neither party submitted the Simsol adjustment,[10] nor was a witness called to explain how Mahood's claim was adjusted by Simsol or what the $83,053.54 covered. The court cannot determine whether Simsol's adjustment was unreasonable.

David Ozeroff's estimate of Mahood's flood loss included items not covered by the policy and was clearly excessive; it cannot be relied on for an accurate evaluation of the covered loss. Ozeroff's esti-

---

8. *See* 44 C.F.R. Pt. 61, App. A(1), Art. 9R (1998) ("If you do sue, you must start that suit within 12 months from the date we mailed you notice that we have denied your claim....").

9. The policy provided Mahood coverage in the amount of $250,000.00. The full replacement cost of the Mahood home is $296,000.00. The insurance is 84% of the full replacement cost.

10. The Simsol adjustment was provided to the court at trial as part of D–2, Omaha's claim file for Mahood's flood loss; this exhibit was offered and admitted into evidence for the sole purpose of demonstrating the documents Omaha had in its possession regarding Mahood's flood loss.

mate includes a $80,000.00 painting estimate from David Ryder; the painting was done by another company for $53,676.00 less than that. The Ozeroff estimate of the flood damages should at least have been reduced from $241,569.00 to $187,893.00 (subtracting $53,676.00, the difference between David Ryder's $80,376.00 painting estimate, included in Ozeroff's estimate, and the $26,700.00 actually paid by Mahood for painting). The only way the court could determine what portion (if any) of the Ozeroff estimate should have been paid would have been to compare it with the Simsol adjustment on which the Omaha payment was based. Without such a comparison, there is no evidence Mahood was not claiming duplicative damages because there is no evidence of the items covered by the Simsol adjustment.

■ Alternatively, the court could rely, in part, on Sessa's invoices for 18th Century to determine whether Mahood is entitled to recover more than the amount received; however, at least a portion of the $137,817.00 Mahood paid Sessa was for repairs unrelated to the flood. For example, all of the living room floor joists were replaced, but not all had been flood damaged; some had just deteriorated with age.[11] In addition, "replac[ing] the joist system" in the powder room, was designated as an "upgrade" rather than a simple flood repair in Sessa's estimate.[12] Sessa billed Mahood $7,368.00 for "living room plaster (new walls)," but it is unclear whether the $7,368.00 covered plastering

up to the 39–inch water line or whether the walls were replastered from floor to ceiling. The same is true for an additional $3,035.00 in "plastering and patching" in other unspecified areas of the house.

■ It is the plaintiff's burden to prove the amount he can recover. The court may not guess the reasonable price for repairs covered under the policy. Again, without plaintiff's proof that there were completed repairs covered by the policy but not covered by the Omaha payment, any award for completed repairs may be duplicative. The same is also true for the invoices submitted for work done by McErlean Plumbing & Heating, H & S Electric, Val Jermacans, Charles Goebel & Sons, Inc., and Eldredge–Ferrero.

Plaintiff did not meet his burden of proof as to the additional amount due him under the insurance policy; accordingly, he cannot recover more than the amount already paid plus the amount that had been deducted for depreciation.

### III. CONCLUSIONS OF LAW

1. The court has jurisdiction over the subject matter and the parties.

2. Venue lies in this district.

3. Mahood timely submitted his proof of loss statements to Omaha.

4. Upon the denial of Mahood's second proof of loss statement and request for recovery of the depreciation, Mahood could have submitted supporting documentation, as requested, or invoking Article 9N, sub-

11. Sessa's November 12, 1999 estimate includes $21,210.50 for restoration of the living room floors; this amount covers nine separate jobs (including "remov[ing] joist system" and "supply[ing] and install[ing] ... pressure treated joists"), but it does not apportion that total to each of the nine separate jobs. *See* Ex. P–15. It is also unclear how Sessa's estimate and invoices correlate. The invoices

delineate the "bid amount" for the living room floor at $15,766.50.

12. Sessa estimated it would cost $5,117.50 to restore the powder room floor system, but did not apportion that amount to each of the five jobs listed under that heading. *See* Ex. P–15. It is unclear how Sessa's estimate and invoices for the completed work correlate.

mitted the claim to a disinterested appraiser.

5. Mahood and Omaha have waived their rights to invoke Article 9N.

6. No policy provision expressly requires an insured to produce documentation of actual repairs in order to recover the amount expended on repairs.

7. Mahood's failure to submit supporting documentation or invoke Article 9N does not preclude him from filing suit to recover under the policy.

8. Omaha should not have deducted any depreciation from its estimate of Mahood's claim.

9. Mahood is entitled to recovery of the $9,721.15 deducted as depreciation.

10. Mahood failed to meet his burden of proof on the amount of his covered flood loss in excess of the Simsol estimate (minus the $1,000.00 deductible) which has already been paid except for depreciation.

11. Judgment will be entered for Mahood in the amount of $9,721.15.